UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION PLAINTIFF, | : : : | 2005 JUL 21  P 3: 37 |
| | : | U.S. DISTRICT COURT |
| v. | : | |
| | : | CIVIL ACTION NO. |
| COMPETITIVE TECHNOLOGIES, INC., ET AL., DEFENDANTS. | : : : : : | 3:04-cv-1331 (JCH)  JULY 21, 2005 |

## RULING ON DEFENDANTS' MOTIONS TO DISMISS [DKT. NOS. 21 and 22]

Plaintiff, Securities and Exchange Commission ("SEC"), brings this action against defendants Competitive Technologies, Inc. ("CTT"), Chauncey D. Steele, John R. Glushko, Thomas C. Kocherans, Richard A. Kwak, Sheldon A. Strauss, Stephen J. Wilson, and Frank McPike pursuant to sections 9(a), 10(b), 20(d), 21, and 27 of the Securities Exchange Act of 1934, Rule 10b-5 thereunder, and sections 17(a), 20, and 22 of the Securities Act of 1933. 15 U.S.C. §§ 77t, 77q(a), 77v(a), 78aa, 78i(a), 78j(b), 78t(e), 78u,  17 C.F.R. § 240.10b-5.  In Counts I, II, and V, the SEC allege that defendants CTT and McPike engaged in illegal manipulation of the stock price of CTT through "matched orders" and other forms of stock purchase manipulation, and aided and abetted defendant Steele's fraudulent actions.  CTT and McPike have moved to dismiss the Complaint in its entirety as against them for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons set out below, defendants' motions are denied.

## I.   BACKGROUND[1]

CTT is a Connecticut-based firm that is traded publicly on the American Stock Exchange.  Compl. at ¶ 5.  During the events at issue in this suit, Frank McPike served as CFO and acting CEO of CTT and was authorized by its board of directors to implement a stock repurchasing plan through which he made transactions in the company's stock. Id. at ¶ 17, 19.

The SEC alleges that McPike, and CTT through McPike, along with the other defendants, all of whom are stock brokers, participated in a scheme orchestrated by defendant Steele to artificially raise the price of CTT stock. Id. at ¶ 1.  The scheme operated from the summer of 1998 until the summer of 2001, during which time the price of CTT stock rose from $3 per share to a high of $23 per share in 2000 before falling back to $3 in 2001.  Id. at ¶ 4, 20.  The scheme, as practiced by McPike and the other brokers, utilized several techniques that served to create a misleading appearance of active trading and increased demand for the stock. Id. at ¶ 1.  The defendants placed late-day orders to raise the reported closing price of the stock (i.e. "marking the close"), placed successive, small-amount buy orders in increasing prices to simulate increased demand (i.e., "painting the tape"), and arranged identical buy and sell orders and other buy orders, to simulate active trading and to offset the impact of other sales of the stock ( i.e., "matching orders"). Id. at ¶ 1, 4, 29-43.

McPike, and CTT through McPike, allegedly participated in the scheme by

---

[1]The court takes the facts alleged in the SEC's Complaint as true, as it must, and draws all inferences in the SEC's favor.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984).

arranging, at the behest of Steele, to buy orders that offset other sell orders (i.e.,

"matched orders"), and by placing "late-day" orders. Id. at ¶ 42, 48,. Steele called

McPike more than 3,000 times between October 1998 and March 2001, and often left

messages for McPike with the specific number of shares that he wanted McPike to buy.

Id. at ¶ 48. McPike seemingly often complied with Steele's requests; more than 50% of

CTT's stock repurchases occurred within ten minutes of a phone call from Steele. Id. at

¶ 49, Ex. H. At least several of these stock purchases constitute "matched orders." See

Id. at ¶ 50, Ex. I. For example, on November 13, 2000, at 1:39 pm, Steele placed a sell

order for 9000 shares of CTT at 6 9/16. Id. at Ex. I. At 1:42 pm, Steele called McPike

and left the message: "It's done." Id. McPike then placed a buy order for 10,000 shares

of CTT at 6 9/16 that was executed at 1:44 pm. Id. Many of McPike's purchases

occurred after 3:00 pm and may be considered "late-day" orders as well. Id. at ¶ 42.

The SEC alleges that McPike had a motive to participate in this scheme because

he believed that increasing the price of CTT stock would help him achieve the goal of

being named the permanent CEO of CTT, as well as because he held stock options

which would vest earlier if CTT's stocks rose to certain levels. Id. at 28. The SEC also

alleges that McPike engaged in these stock-buying practices "in order to raise or

maintain the closing price of CTT stock at an artificially high level" and "for the purpose

of . . . creating a false or misleading appearance with respect to the market for CTT

stock, and inducing others to purchase CTT stock." Id. at 53, 57.

The SEC filed their complaint against the defendants on August 11, 2004. CTT

and McPike moved to dismiss the complaint against them on September 24, 2004.

CTT and McPike argue that the counts against them are barred by the "safe harbor"

-3-

provided by SEC Rule 10b-18, which prohibits the SEC from bringing enforcement actions against stock issuers based on certain types of evidence in some instances. 17 C.F.R. § 240.10b-18. They further argue that, to the extent that they fall within the 10b-18 safe harbor, the SEC cannot, as a matter of law, ascribe an unlawful intent to their actions. Consequently, CTT and McPike argue that the SEC has insufficiently alleged that CTT and McPike had the requisite intent and purpose to sustain its claims for manipulation and fraud under Securities Exchange Act Sections 9(a) and 10(b). 15 U.S.C. §§ 78i(a), 78j(b).

## II.   STANDARD OF REVIEW

A motion to dismiss filed pursuant to Rule 12(b)(6) can be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). See also Reed v. Town of Branford, 949 F. Supp. 87, 89 (D. Conn. 1996). In considering such a motion, the court accepts the factual allegations alleged in the complaint as true and draws all inferences in the plaintiff's favor. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183 (1984). "In considering a motion to dismiss . . . a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference . . . [and review all allegations] in the light most favorable to the non-moving party." Newman & Schwartz v. Asplundh Tree Expert Co., Inc., 102 F.3d 660, 662 (2d Cir. 1996). Rule 8 of the Federal Rules of Civil Procedure provides that a complaint "shall contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); see also Swierkiewicz v. Sorema

-4-

N.A., 534 U.S. 506, 512 (2002).

## III.    DISCUSSION

### A.    The Rule 10b-18 Safe Harbor

SEC Rule 10b-18 provides immunity from liability for manipulation claims for issuers of stock engaged in repurchasing when the issuers conduct their buy backs according to the time, price, and manner conditions contained in the Rule. 17 C.F.R. § 240.10b-18.  One of the conditions to fit within the 10b-18 safe harbor, for example, is that the purchase of stock must not occur during the 30 minutes before the scheduled close of the market in order to fit within the 10b-18 safe harbor. 17 C.F.R. § 240.10b18(b)(2)(iii). The Rule provides that:

> Rule 10b-18 purchases shall not be deemed to have violated the anti-manipulation provisions of sections 9(a)(2) or 10(b) of the Act . . . or § 240.10b-5 under the Act, solely by reason of the time, price, or amount of the Rule 10b-18 purchases, or the number of brokers or dealers used in connection with such purchases, if the issuer. . .[meets the conditions set out in the Rule].

17 CFR. § 240.10b18(b).

CTT and McPike claim to have complied with Rule 10b-18 in effectuating CTT's stock purchases in all instances, and thus argue that Rule 10b-18 precludes suit against them.  This argument fails for several reasons.  First, the Rule 10b-18 safe harbor is only available for manipulation claims under Sections 9(a)(2) and 10(b) of the Exchange Act, and thus would not provide protection to the defendants from the Section 9(a)(1) and Section 20(e) aiding and abetting counts that are charged against them in the First and Fifth Counts of the Complaint . Second, it would be inappropriate, and unwarranted by the facts as alleged by the SEC, to make a factual finding at this

juncture concerning the degree of defendants' compliance with Rule 10b-18.[2]

Finally, even if defendants were able to demonstrate total compliance with Rule 10b-18, they are not entitled to the broad, protective reading of that rule that they urge. By its own language, Rule 10b-18 provides protection from enforcement actions for manipulation that are based <u>solely</u> on the timing, price, amount, or manner of a stock purchase. It does not work as a bar on <u>all</u> enforcement actions involving stock re-purchases that meet the Rule 10b-18 requirements; actions for manipulation that are predicated on allegations and evidence other than the timing, price, amount, and manner of purchases are not barred by Rule 10b-18. In this instance, the SEC's action is based at least in part on the phone calls, phone messages, and relationship between McPike and Steele, as well as McPike's pattern of stock purchases.[3] Thus, regardless

---

[2]While the SEC's Complaint alleges that "virtually all" stock purchases by CTT occurred before 3:30, and while it does not allege a specific instance of a stock purchase that occurred after 3:30, drawing all inferences in favor of the plaintiff leads the court to conclude that "virtually all" means "not all" for purposes of this motion to dismiss, and thus the court cannot conclude that all of the conditions of Rule 10b-18 have been complied with for all of CTT's purchases. Compl. ¶ 42. In addition, the facts as alleged by the SEC do not support an affirmative finding that all other conditions of Rule 10b-18 have been met.

[3] The defendants argue that participating in stock repurchase programs, making late-day purchases before 3:30, or engaging in some instances in matched trades, is not <u>per se</u> illegal and thus can not serve as the basis of liability. Similarly, the defendants argue that the "mere fact" that Steele made many calls to McPike cannot support an finding of manipulative intent on the part of McPike. These assertions are true, but besides the point. The SEC has not based its case solely on the defendants' participation in a stock repurchase program, nor solely on the number of calls between Steele and McPike, but rather the pattern of trading that was implemented in the name of the repurchase program and the content of the calls between Steele and McPike. Such allegations, when taken as a whole, demonstrate that the SEC has sufficiently alleged a set a facts and a basis for an inference of intent that gives rise to their claims. <u>See</u> <u>Crane Co. V. Westinghouse Air Brake Co.</u>, 419 F.2d 787, 794 (2d Cir. 1969) cert. denied, 400 U.S. 822 (1970)("The requisite purpose and willfulness [for securities

-6-

of whether CTT and McPike complied with Rule 10b-18 in repurchasing its stock, the action as presented in the Complaint is not barred by Rule 10b-18.

Defendants also argue that Rule 10b-18 necessitates a finding that, as a matter of law, stock repurchases that are made in accordance with the Rule 10b-18 conditions cannot be deemed to have been carried out with manipulative intent.  That is to say that, since Rule 10b-18 purchases are designed to minimize their impact on a stock's price, it follows that a Rule 10b-18 purchaser cannot make such a purchase with the intent of manipulating the stock price and thus a claim for manipulation cannot be made out against it. However, the text of Rule 10b-18 contradicts this argument, as it makes clear that it is possible to be in technical compliance with Rule 10b-18 while still participating in an illegal manipulation scheme:

> The safe harbor, moreover, is not available for repurchases that, although made in technical compliance with the section, are part of a plan or scheme to evade the federal securities laws.

17 C.F.R. § 240.10b-18 (Preliminary Note 1).  Thus, the law itself recognizes that it is possible to both comply with Rule 10b-18 and intentionally engage in an a manipulative scheme that could give rise to claims under Sections 9(a) and 10(b) of the Exchange Act.[4]

## B. Pleading Sufficiency of 10(b) and 9(a) claims

In addition to their arguments premised on 10b-18, the moving defendants argue

---

manipulation claims under Section 9(a)] is normally inferred from the circumstances of the case.").

[4] For the same reasons, the defendants' argument that imposing liability in the face of Rule 10b-18 violates the defendants' due process rights fails as well.

that the SEC's Complaint insufficiently alleges the elements of scienter and

manipulative purpose and necessary to make out claims under sections 10(b) and 9(a).

In reviewing the SEC's Complaint in light of the elements of these claims and the

relevant pleading standards, the court finds that the Complaint is sufficiently plead.

Section 10(b), and Rule 10b-5, thereunder, are the general prohibitions on fraud

in the Exchange Act.  Section 10(b) proscribes the use "in connection with the purchase

or sale of any security" of "any manipulative or deceptive device or contrivance" as

defined by the SEC. 15 U.S.C. §78j(b); Nanopierce Technologies, Inc. v. Southridge

Capital Management LLC, 2002 WL 31819207, at *7, Fed. Sec. L. Rep. 92,253

(S.D.N.Y. 2002).  Rule 10b-5 makes it "unlawful for any person, directly or indirectly, by

the use of any means or instrumentality of interstate commerce, or of the mails or of

any facility of any national securities exchange . . . [t]o employ any device, scheme, or

artifice to defraud." 17 CFR § 240.10b-5.

These provisions are violated when a defendant (1) makes a material

misrepresentation or a material omission as to which he had a duty to speak, or used a

fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of

securities." S.E.C. v. Prater, 289 F.Supp.2d 39, 52 (D.Conn. 2003) (citing S.E.C. v

Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1995). The defendants' alleged

manipulative scheme to engage in matched buying  can constitute a "device" or

"scheme" for the purpose of 10(b) and Rule 10b-5.  See SEC v. Malenfant, 784 F.Supp.

141, 145 (S.D.N.Y. 1992); Nanopierce, 2002 WL 31819207 at *7.

Because violations of section 10(a) are allegations of fraud, they must be plead

with particularity under Fed. R. Civ. P. 9(b).  Novak v. Kasaks, 216 F.3d 300, 306 (2d

Cir. 2000). However, because the mechanisms of a manipulation scheme are "likely to be unknown to plaintiffs," the requirements of Rule 9(b) are "somewhat relaxed" when applied to allegations of manipulation under section 10(b) and Rule 10b-5. Endovasc Ltd. V. J.P. Turner & Co., LLC., 2004 WL 634171, at *5, Fed.Sec.L.Rep. 92,70 (S.D.N.Y. 2004)(citing SEC v U.S. Environmental, Inc., 82 F.Supp.2d 237, 240 (S.D.N.Y. 2000)). Thus, to meet the requirements of Rule 9(b), a market manipulation claim under section 10(b) "must specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." Id.

Here, the plaintiff has generally plead that defendants Steele, Glushko, Kocherans, Kwak, Strauss, Wilson, McPike, and CTT through McPike, were engaged in a manipulative scheme that placed late-day buy orders and matching buy orders "for the purpose of . . . creating a false or misleading appearance with respect to the market for CTT stock." Compl. ¶ 57. The SEC has also alleged numerous specific trades on specific dates, as well as a pattern of phone calls, as factual evidence of such manipulative behavior. Id. at Exs. H, I. The SEC alleges that the defendants' behavior was responsible for raising the closing price of the stock on many occasions. Id. at ¶ 35, 37-42. As in U.S. Environmental, Inc., where the plaintiff met its pleading burden by including in its complaint "detailed descriptions of a few sample trades" and more general allegations that the defendant executed "matched orders" with the effect of inflating the market price of the stock, the SEC, in the instant case, by including in its Complaint exhibits detailing a series of allegedly fraudulent trades, has met its Rule 9(b) pleading burden as to its factual claims of fraud under section 10(a). 82 F.Supp. at

240.

Scienter, for the purpose of securities fraud laws, is defined as "a mental state embracing intent to deceive, manipulate or defraud." Fezzani v. Bear, Stearns & Company, 2004 WL 744594, at *14, Fed. Sec. L. Rep. P 92,773 (S.D.N.Y. 2004) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). To satisfy Rule 9(b), a plaintiff's scienter allegations must "give rise to a strong inference of fraudulent intent" which the plaintiff can establish either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of evidence of conscious misbehavior or recklessness." Kalnit v. Eichler, 264 F.2d 131, 138 (2d Cir. 2001) (internal citations omitted).

Defendants argue that the SEC has failed to plead scienter sufficiently because it has not alleged a sufficiently strong motive for McPike to engage in the manipulative scheme. However, it is not necessary to determine the sufficiency of the SEC's pleadings on the question of motive. Instead, it is clear that the pattern of phone calls between Steele and McPike in relation to the pattern of McPike's trading, as well as the substance of the phone messages that Steele left for McPike, constitute strong circumstantial evidence of conscious misbehavior on the part of McPike and, through McPike, CTT.[5] As in Malenfant, the alleged communications between the Steele and

---

[5] As McPike served as a principal officer of CTT, and as he was specifically authorized to implement the stock repurchasing program, the actions he took within the scope of that role can be imputed to CTT. See SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1089 n.3 (2d Cir. 1972) (imputing to defendant corporations the knowledge of securities laws violations of attorney who exercised "blanket authority in the matter of securities transactions" for the corporations); S.E.C. v. Ballesteros Franco,

McPike support the inference that the "defendants knew what they were doing and acted intentionally." Malenfant, 784 F.Supp. 141, 145 (S.D.N.Y.,1992) (finding allegations of matched order manipulation scheme sufficient to sustain 10(b) claim where buyer and seller of stock communicated about their buy and sell orders). Thus, having met the factual and intent pleading requirements of 9(b), the SEC has stated a valid claim under section 10(b) and Rule 10b-5.

Section 9(a) of the Exchange Act proscribes specific behavior, such as "matched trades," that may constitute market manipulation.[6] In order "[t]o make out a violation of subsection 9(a)(1) . . . a plaintiff must prove the existence of (1) a wash sale or

---

253 F.Supp.2d 720, 728 (S.D.N.Y. 2003) ("[A] person's knowledge can be attributed to a corporation in connection with actions which that person through his control causes the corporation to take.").

[6] Section 9(a) provides:
(a) It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange--
(1) For the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or a false or misleading appearance with respect to the market for any such security, . . .
(B) to enter an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such security, has been or will be entered by or for the same or different parties, or
(C) to enter any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.
(2) To effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange or in connection with any security-based swap agreement. ..with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others. 15 U.S.C.A. § 78i(a)(1) and (2).

matched orders in a security, (2) done with scienter and (3) for the purpose of creating a false or misleading appearance of active trading in that security . . . . To make out a subsection 9(a)(2) claim, the plaintiff must show  (1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, (2) carried out with scienter and (3) for the purpose of inducing the security's sale or purchase by others" S.E.C. v. Malenfant 784 F.Supp. at 144 (internal quotation omitted); see also Crane Co., 419 F.2d 787.  "Section 9(a)(2) was considered to be the very heart of the act and its purpose was to outlaw every device used to persuade the public that activity in a security is the reflection of a genuine demand instead of a mirage." Crane, 419 F.2d at 794 (quoting 3 Loss, Securities Regulation 1549-55 (2d ed. 1961)) (internal quotation omitted).

Matched orders are "orders for the purchase or sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons for the sale/purchase of such security." SEC v. U.S. Environmental, Inc., 155 F.3d 107, 109 (2d. Cir. 1998) (quoting Ernst & Ernst v. Hochfelder, 425 U.S.185, 205 n.25 (1976)) (internal quotation omitted).  Plaintiffs allege that on at least five occasions, CTT, through McPike, placed a purchase order that was identical to a sell order executed by another defendant at substantially the same time, and on at least seven other occasions, placed purchase orders that were substantially similar in amount to sell orders placed by other defendants.  The orders for each of these twelve purchases were entered at approximately the same time as the sell orders, and on at least nine occasions the purchase orders were preceded by a phone call from Steele to McPike

-12-

within the hour. Compl. ¶ 50, Ex. I.  This pattern of trading supports the inference that matched orders occurred.  It also is a sufficient allegation that a series of transactions occurred that created actual or apparent trading.

Section 9(a) claims must allege that defendants acted with the purpose of creating a false appearance of active trading (in the case of 9(a)(1) claims) and the purpose of inducing others to trade in the stock (in the case of 9(a)(2) claims).  The Complaint specifically alleges that McPike, and CTT through McPike, acted with such purposes, and thus the SEC has met this pleading requirement. Compl. ¶ 53; see, e.g. Malenfant, 784 F.Supp. at 145; Stella v. Kaiser, 82 F.Supp. 301, 313 (S.D.N.Y. 1943). As demonstrated above, the SEC has sufficiently alleged that the defendants had the requisite scienter to support its claims of market manipulation.[7]  Thus, the SEC has stated a valid claim against defendants CTT and McPike for market manipulation under sections 9(a)(1) and 9(a)(2).

Although CTT and McPike have moved to dismiss the Complaint in its entirety against them, they have offered no arguments addressing the claim against McPike for aiding and abetting Steele in his violations of the securities laws.  To establish liability for aiding and abetting, the plaintiff must allege: "(1) a primary violation by another party; (2) knowledge of the violation by the aider and abettor and (3) substantial

_____

[7]The standard for scienter in securities fraud cases has generally been stated in relation to section 10(b) manipulation claims rather than section 9(b) manipulation claims; however courts have consistently applied the same standard to both sets of claims. See, e.g. Fezzani v. Bear, Stearns, & Co., 2004 WL 744594, *14, Fed. Sec. L. Rep. P 92,773 (S.D.N.Y. 2004), S.E.C. v Schiffer, S.E.C. v. Schiffer  1998 WL 226101, *3, Fed. Sec. L. Rep. (CCH) P90,213 (S.D.N.Y. 1998); S.E.C. v. Malenfant, 784 F.Supp. 141, 145 (S.D.N.Y. 1992).

assistance by the aider and abettor." <u>S.E.C. v. Lybrand</u> 200 F.Supp.2d 384, 399 (S.D.N.Y. 2002) (internal citation omitted).   The SEC has sufficiently alleged primary violations of the securities laws by Steele in its Complaint, and the foregoing discussion makes clear that it has sufficiently plead that McPike had knowledge of Steele's behavior and provided him with substantial assistance in performing, among other acts, matched orders. Thus, CTT and McPike's motion to dismiss the SEC's aiding and abetting claim against McPike and CTT is denied.

## IV.    Conclusion

For the foregoing reasons, McPike and CTT's motion to dismiss the SEC's complaint is **DENIED**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut this 21th day of July, 2005.

Janet C. Hall
United States District Judge