UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION : | |
| Plaintiff : | |
| : | CIVIL ACTION NO.: |
| v. : | 3:04-cv-1331 (JCH) |
| : | |
| RICHARD A. KWAK, SHELDON A. : STRAUSS, and STEPHEN J. WILSON : | |
| Defendants : | FEBRUARY 12, 2008 |

**RULING RE: DEFENDANTS' MOTIONS FOR JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL [Doc. Nos. 272, 273, 274, 275]**

In November 2007, this court held a civil jury trial in the instant securities case. Plaintiff, the SEC, brought a civil enforcement action against defendants Richard A. Kwak, Sheldon A. Strauss, and Stephen J. Wilson.[1] The SEC alleged that each defendant had violated sections 9(a)(1), 9(a)(2), and 10(b) of the Exchange Act, and section 17(a) of the Securities Act. The SEC also alleged that each defendant had aided and abetted violations of sections 9(a)(1), 9(a)(2), and 10(b) by Chauncy Steele. The jury found for the SEC on all of its claims against Strauss. The jury returned a verdict for Kwak and Wilson on the section 17(a) claim. The jury was unable to reach a verdict on the remaining claims, and the SEC has indicated its intent to proceed with a second trial on these claims.

Pursuant to Rule 50, Kwak and Wilson ask this court to enter judgment in their favor on the outstanding claims. Pursuant to Rules 50 and 59, Strauss asks this court to enter judgment in his favor, or in the alternative to grant him a new trial. The court

---

[1] Several other defendants were named in the Complaint, but they subsequently settled with the SEC.

1

**DENIES** the motions.

I.     **BACKGROUND**

This securities case arose out of an alleged scheme to manipulate the stock price of Competitive Technologies, Inc. ("CTT"). Kwak and Wilson were brokers who bought and sold CTT stock on behalf of their customers, as well as for their personal accounts and the accounts of their family members. Strauss was a former broker who engaged in CTT transactions on his own behalf through accounts managed by other brokers.

The SEC's case at trial was built around the theory that all three defendants had, to varying degrees, been part of a broader scheme to manipulate the price of CTT stock – a scheme that had been orchestrated by Chauncy Steele. This scheme allegedly operated in two ways: by "matching trades" in violation of section 9(a)(1) and by "marking the close" in violation of section 9(a)(2).

A matched trade takes place when a person buys or sells a stock, with knowledge that a substantially offsetting transaction is going to be entered into by someone, in order to mislead others about the extent of the activity in, or the market for, a given stock. 15 U.S.C. § 78i(a)(1)(B)-(C). Unlawful marking the close takes place when an individual engages in a series of late day transactions that create "actual or apparent active trading in [a] security, or rais[e] or depress[] the price of such security, for the purpose of inducing the purchase or sale of such security by others." Id. § 78i(a)(2); see also SEC v. Schiffer, 1998 WL 307375, at *6 (S.D.N.Y. June 11, 1998).

Either practice would also violate section 10(b)[2] if done with scienter.  See SEC v. U.S. Envtl., Inc., 155 F.3d 107, 111 (2d Cir. 1998); Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 795-96 (2d Cir. 1969) (explaining that failure to disclose a manipulation operates as a fraud or deceit on other investors).  And given the similarity between section 10(b) and section 17(a), such violations of section 10(b) would also violate section 17(a) if done in connection with the sale of securities.  See 15 U.S.C. § 77q(a).

Finally, in an SEC enforcement action, a defendant will be liable for aiding abetting another's violation of section 9(a)(1), 9(a)(2), or 10(b), if that other person violated the relevant statute, and the defendant provided knowing and substantial assistance to that individual.  See IIT v. Cornfeld, 619 F.2d 909, 922 (2d Cir. 1980);

---

[2] Section 10(b) is a general prohibition on manipulation and fraud.  Section 10(b) makes it unlawful for someone to employ "a manipulative or deceptive device" that is "in connection with" a securities transaction, and that violates Rule 10b-5.  15 U.S.C. § 78j(b).  Rule 10b-5 makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

SEC v. Lybrand, 200 F. Supp. 2d 384, 399 (S.D.N.Y. 2002), aff'd on other grounds sub. nom. SEC v. Kern, 425 F.3d 143 (2d Cir. 2005).

## II.     KWAK & WILSON'S RULE 50 MOTIONS

Rule 50(b) empowers a trial court to enter judgment as a matter of law, even when no verdict is returned by the jury, if the evidence shows that a party is entitled to such a judgment. See Fed. R. Civ. P. 50(b)(2). In evaluating a party's Rule 50(b) motion, however, the court must evaluate "the evidence in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences that the jury might have drawn in its favor." Affordable Housing Found., Inc. v. Silva, 469 F.3d 219, 227 (2d Cir. 2006). This is a high bar for Kwak and Wilson to reach, and they do not do so here.

As an initial matter, Kwak and Wilson spend a significant amount of time emphasizing their own testimony, and the testimony of their customers, that they were merely executing orders on behalf of their clients. They also point out that the SEC did not have evidence of the kinds of orders that Kwak and Wilson placed, or of the times that these orders were entered, and they observe that Kwak and Wilson did not profit from the relevant stock transactions.

Unfortunately for Kwak and Wilson, the jury was not required to believe the defendants' testimony, or the testimony of the defendants' witnesses,[3] and the SEC

---

[3] On numerous occasions in their Motions, Kwak and Wilson refer to many aspects of their and their customers' testimony as largely "undisputed" or "uncontroverted." See, e.g. Kwak Mem. at 2, 10, 11, 14, 19; Wilson Mem. at 2. Many of these so-called "undisputed" facts were directly challenged on cross-examination, see, e.g. Trial Tr. at 921-23; 1352-56; 1358-59, or were inconsistent with the inferences the SEC asked the jury to draw from other evidence.

4

placed evidence before the jury that could demonstrate stock manipulation in violation of the relevant statutes. In particular, there were three key pieces of evidence in support of the SEC's position.

First, Strauss admitted on the stand that, between 1998 and 2001, he participated in a scheme, with Chauncy Steele and "others," that engaged in a number of practices designed to manipulate the price of CTT stock. Trial Tr. at 277. Strauss testified that one of the group's practices was to engage in concentrated late day trades, with the goal of showing either artificial upward movement in the stock price, or at least preventing downward movement. Id. at 280-81. He also testified that Steele's stated motive, in soliciting Strauss to engage in these trades, was in part to make the stock appear more actively traded than it really was, and to make it appear that the stock had upward movement. Id. at 282; 297-98. In other words, the scheme participants purchased stock in order to manipulate the market into thinking that demand for the stock was higher than what would be created by normal market forces.[4]

Additionally, Strauss testified that Steele solicited manipulative trades at all times of the day, not just late in the day. Id. at 282-83. Also, according to Strauss, Steele became concerned that his trading patterns would attract attention, and so he solicited "others" to engage in these trades in CTT stock. Strauss and Kwak were among the individuals that were solicited, and Steele specifically told Strauss that Kwak was one of

---

[4] Of course, on some occasions the price of the stock may have been unchanged, or may even have gone down, despite the efforts of the scheme participants. But that was perfectly consistent with Strauss's testimony. By artificially creating demand, one can prevent or slow price decreases, even if one is unable to create price increases.

the people he turned to in order to make suspect trades.[5] Id. at 284-86. Strauss did not give admissible evidence directly linking Wilson to the scheme.

The second key category of evidence in the SEC's favor was evidence of voluminous phone calls between the various alleged participants in the scheme, including Wilson and Kwak. Although there was no evidence of what was said during the calls, these calls certainly demonstrated that Wilson and Kwak spoke frequently with Steele and other alleged participants in the scheme, including participants that Strauss had specifically named. In addition, many of these calls were temporally close to trades that the SEC believed to be suspect.

The third key piece of evidence was the testimony of the SEC's expert, Robert Lowry. Lowry testified as an expert on market manipulation, and he testified that he looked at trading records, telephone records, and other data, regarding this alleged manipulative scheme. Id. at 567-68. Lowry's testimony identified several patterns in the data, including significant late day trading, and trades where one or more alleged scheme members were on both the buy and sell sides of a transaction. Id. at 568-69. Lowry noted that these patterns would tend to appear only on days when the stock price was declining, or when there was little other activity in the market. Id. Lowry testified that the trading activities of Wilson, Kwak, and Strauss fit these patterns. Id. at 570-71.

Lowry's testimony also suggested motives for the patterns he observed. In particular, he noted that investors can be motivated to keep prices above a certain level

---

[5] Although this statement was hearsay, the court admitted it as a co-conspirator statement. See Fed. R. Evid. 801(d)(2)(E).

so that a stock will not be delisted from its exchange. Id. at 619-20. CTT was listed on the AMEX and, for much of the relevant period, it traded at a relatively low price. Additionally, Lowry noted the importance of avoiding stock fluctuations, as stocks that fluctuate up and down are not as attractive to investors. Id. at 620. Lowry's testimony thus provided further reason to think that the scheme Strauss described was a scheme motivated by reasons other than a simple desire to purchase CTT for its inherent investment value.

Taken together, this evidence could rationally support a verdict in favor of the SEC and against Kwak and Wilson on all claims, including the aiding and abetting claims. Strauss's testimony established that Chauncy Steele orchestrated a scheme to artificially manipulate the price of CTT stock through late day trades (i.e. marking the close) and other methods. Lowry's testimony could be understood to establish that this scheme also included matched trades, particularly when combined with Strauss's testimony that more than one manipulative method was used. Further, the phone calls,[6] plus Lowry's testimony about trading patterns and the likely motivations behind them, provide circumstantial evidence that Kwak and Wilson were among the "others" that were part of Steele's manipulative scheme, and that in fact intentionally assisted Steele in the realization of this scheme.

This evidence is sufficient to show that Kwak and Wilson engaged in a number of transactions with the prohibited intent. The vast majority of arguments that Kwak and

---

[6] In Kwak's case, the phone call evidence was enhanced by testimony from Strauss that Kwak participated on several conference calls discussing the manipulative scheme.

7

Wilson make in their Motion, challenging virtually every element of each offense, simply fail to view the evidence in the light most favorable to the SEC.

Kwak and Wilson do, however, make several arguments that require further discussion. First, Wilson contends that because the jury found for him on the section 17(a) claim, the jury necessarily should have found for him on the section 9(a)(1) and section 10(b) claims. Wilson Mem. at 14-17. This is essentially a claim that the jury verdict was inconsistent,[7] and the problem for Wilson is that the remedy for inconsistent verdicts is to order a new trial. See Kosmynka v. Polaris Indus., 462 F.3d 74, 82 (2d Cir. 2006). Wilson is already getting a new trial on the section 9(a)(1) and 10(b) claims (along with all the other claims aside from the section 17(a) claim). If the verdicts were truly inconsistent, the only additional thing the court could do at this point would be to vacate the sole verdict in Wilson's favor and order a new trial on that claim as well. The court does not understand Wilson to be requesting that course of action.

Second, Kwak and Wilson appear to believe that, because all of their trades were executed on behalf of real individuals in the open market and did not contain the traditional hallmarks of manipulation, they cannot be guilty of market manipulation. Kwak Mem. at 16-18; Wilson Mem. at 22-23. This theory is misguided.

The sole controlling case that Kwak and Wilson rely on is United States v.

---

[7] Wilson refers to his claim as one for "collateral estoppel." However, collateral estoppel cannot be invoked unless there is a final judgment. See Grieve v. Tamerin, 269 F.3d 149, 153-54 (2d Cir. 2001). The section 17(a) verdict for Wilson is not yet a final judgment because the SEC has not yet had the opportunity to appeal the judgment entered on that claim. See id. (explaining that a district court judgment is only final after no appeal is taken); Fed. R. Civ. P. 54(b) (explaining the rules for finality of judgments when some claims in the case are still outstanding).

Mulhern, 938 F.2d 364 (2d Cir. 1991). But that case, which did not even involve claims under section 9(a), see id. at 365, is not on point.[8] Mulhern held simply that when the government alleges that an individual purchased stock with the sole intent to inflate the price, section 10(b) requires the government to introduce sufficient evidence of that intent. See id. at 368-369. To the extent that Mulhern talked about an absence of traditional hallmarks of manipulation, and the fact of purchase in the open market, it did so merely to show the absence of any evidence of manipulative intent. See id. at 370-71. Nothing in the case suggested that open market purchases created a safe harbor for defendants, or that section 10(b) claims (or section 9(a) claims) could only be brought in traditional manipulation cases.[9]

Here, while there may not have been traditional indicia of manipulation, there was nonetheless sufficient evidence of manipulation. The kind of manipulation involved here was a manipulation in which the defendants, and others, bought stock in order to prevent the stock from being delisted (which would have made the stock less attractive to investors) and/or to create an illusion that the stock price was more stable than it

---

[8] Mulhern specifically noted that the defendant in that case had not been accused of purchasing stock with the intent of inducing purchases or sales by others. Id. at 368. Such an intent is of course an element of section 9(a)(2).

[9] Kwak also relies on United States v. Russo, 74 F.3d 1383, 1394 (2d Cir. 1996), to establish the related proposition that a stock scheme is only manipulative if it actually raises the price of a stock above what market forces would normally dictate the price to be. Kwak Mem. at 13. Russo stands for no such proposition; the passage Kwak relies on is excerpted from a jury instruction given by the trial court in that case, and which the Second Circuit did not necessarily endorse because it resolved the case on harmless error grounds. Id. The court further notes that Russo was not a section 9(a) case, and thus did not purport to rule on the required elements in section 9(a)(1) and 9(a)(2) cases.

9

really was (which it was hoped would attract more investment in CTT stock). While unorthodox, such a manipulation is plainly still deceptive under section 10(b) because it tricks investors into believing that the reported prices for CTT stock reflect transactions that are solely the product of independent forces of supply and demand.[10]  See SEC v. Malefant, 784 F. Supp. 141, 145 (S.D.N.Y. 1992); cf. Gurary v. Winehouse, 190 F.3d 37, 45 (2d Cir. 1999) ("The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand . . . ."). This conduct also plainly fits within the intent requirements laid out in the text of sections 9(a)(1) and 9(a)(2).[11]

---

[10] Kwak and Wilson suggest that, at best, the SEC's evidence showed they had mixed motives in making the prohibited transaction: they sought to manipulate the stock price and they wanted to own the stock for its inherent investment value. They contend that in such a mixed motive case, the SEC must show that the transactions would not have been entered into but for the existence of manipulative intent. See, e.g. Wilson Br. at 9 (citing SEC v. Masri, 523 F. Supp. 2d 361, 372-73 (S.D.N.Y. 2007)).

This proposed standard may make some sense for section 10(b) purposes under the theory that there is nothing deceptive about a transaction if the exact same transaction would have been entered into absent the manipulative intent. (Its utility for section 9(a) cases is less clear). Yet that theory loses its applicability if the prohibited intent alters the trade in any material respect (e.g. by changing the time at which the trade would otherwise have been executed). In any event, in this case the SEC produced sufficient evidence that Kwak and Wilson engaged in trades at particular times, and in particular amounts, because of their desire to assist Steele in his manipulative scheme.

[11] Section 9(a)(1) makes it unlawful for any person:

> For the purpose of creating a false or misleading appearance of active trading in any security registered on a national securities exchange, or a false or misleading appearance with respect to the market for any such security . . . (B) to enter an order or orders for the purchase of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the sale of any such

10

Kwak and Wilson also rely on an unpublished district court case, In re College Bound Consolidated Litig., Nos. 93 Civ. 2348 and 94 Civ. 3033, 1995 WL 450586, at *5 (S.D.N.Y. July 31, 1995). This case is not persuasive. First, the case only considered a section 10(b) claim. Id. at *1. In that regard, the court finds the case unpersuasive in determining liability under sections 9(a)(1) and 9(a)(2) because the plain text of those provisions encompass the defendants' actions. Second, the College Bound court read Mulhern the same way that Kwak and Wilson do. See id. at *5-7. This court has already rejected that reading of Mulhern. Indeed, another district judge in this circuit has also rejected College Bound for exactly this reason. See In re Initial Public Offering Securities Litig., 241 F. Supp. 2d 281, 391 (S.D.N.Y. 2003) (explaining that "Mulhern is not an opinion purporting to announce the elements for some new cause of action" for market manipulation, and noting that Mulhern was simply an opinion that evaluated the

---

> security, has been or will be entered by or for the same or different parties, or (C) to enter any order or orders for the sale of any such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security, has been or will be entered by or for the same or different parties.

15 U.S.C. § 78i(a)(1) (emphasis added). Section 9(a)(2) makes it unlawful for any person:

> To effect, alone or with one or more other persons, a series of transactions in any security . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

15 U.S.C. § 78i(a)(2) (emphasis added).

11

probative value of the circumstantial evidence adduced in that specific case).

Finally, Wilson relies on a Third Circuit case, GFL Advantage Fund, Ltd. v. Colkitt, 272 F.3d 189 (3d Cir. 2001), which he asserts stands for the proposition that an open market transaction is not deceptive (under section 10(b)) unless the defendant injects inaccurate information into the marketplace, or creates a false impression of supply and demand for the security. Wilson Reply at 7. This does not assist Wilson because the SEC presented the needed evidence. As discussed above, there was evidence that Wilson (and Kwak) engaged in various transactions specifically late in the day, or specifically to offset the trades of others, for the purpose of maintaining or raising the price of CTT stock. Additionally, there was further evidence that these trades were engaged in for the purpose of misleading the market about the extent of demand for CTT stock.[12]

It is certainly clear that a jury could have returned a verdict in favor of Kwak and Wilson. And in an earlier evidentiary ruling, the court itself concluded that the SEC had

---

[12] Wilson's contrary argument misreads the case. Wilson suggests that the Third Circuit rejected the position of the claimant in GFL, who had argued that he needed only to demonstrate that the other party's questionable trades were undertaken "for the undisclosed purpose of artificially [affecting] share prices." Wilson Reply at 7 (citing GFL, 272 F.3d at 204). In fact, however, the Third Circuit recognized that, if the trades were done in this manner, they would be deceptive under section 10(b). See GFL, 272 F.3d at 204.

Wilson nonetheless relies on the Third Circuit's statement, seven pages later in the opinion, that the claimant in GFL "needed to 'present evidence that GFL engaged in some other type of deceptive behavior." Wilson Reply at 8 (citing GFL, 272 F.3d at 211). This statement is taken out of context. What the court was referring to in the quoted passage was merely its conclusion that the plaintiff in that case had failed to produce sufficient evidence to believe that GFL had engaged in the relevant trades for artificial purposes. See GFL, 272 F.3d at 211. Had the claimant shown that GFL had sold stock for the purpose of artificially deflating the price, the claimant would have demonstrated a section 10(b) violation. See id.

not established its claims against Wilson by a preponderance of the evidence. But as the court explained at the time it made that evidentiary ruling, the jury, and not the court, is the ultimate factfinder in this case. The SEC presented sufficient evidence to enable the jury to return a verdict against Kwak and Wilson. Kwak and Wilson's Motions are **DENIED**.

### III. STRAUSS'S MOTIONS

Strauss asks this court to grant him judgment as a matter of law under Rule 50(b). Strauss Mem. at 1. In the alternative, he argues that he is entitled to a new trial pursuant to Rule 59(a) because of various asserted errors.

As an initial matter, this court cannot grant Strauss's motion for judgment as a matter of law because Strauss failed to make a Rule 50(a) motion at any point before the case was submitted to the jury. See McCardle v. Haddad, 131 F.3d 43, 50-51 (2d Cir. 1997) (explaining that the federal rules do not permit a party to make its first motion for judgment as a matter of law after the jury has returned its verdict); see also Trial Tr. at 821-60; 1567-02; 1607-43; 1647-66. In any event, in light of Strauss's admissions, see supra p. 5-6, the evidence against him was significantly stronger than the evidence against Kwak and Wilson, and there is no basis to grant judgment in Strauss's favor.[13]

---

[13] To the extent Strauss seeks a new trial based on a claim that the verdict was against the weight of the evidence, the court denies the motion. Strauss admitted on the stand that he engaged in concentrated late day purchases with the intent to influence the market for CTT stock. In light of this, the evidence against Strauss on the section 9(a)(2) and section 10(b) claims, and the aiding and abetting claims related to those provisions, was overwhelming. The evidence was not as overwhelming with regard to the other claims, but certainly not so lacking as to require a new trial.

Strauss suggests that all of his alleged matched trades in violation of section 9(a)(1), and all of his sell-related transactions that would implicate section 17(a), were the result of involuntary margin calls, and/or involuntary sales made by Steele on his

13

Additionally, Strauss's arguments for a new trial lack merit. Renewing an earlier objection, Strauss suggests that it was prejudicial for the SEC to assert in its closing that Strauss had "admitted" the relevant violations. Strauss Mem. at 2. However, Strauss testified that he had participated in a scheme to engage in late day trades for the purpose of raising the price of CTT stock. Strauss thus effectively admitted to having participated in a manipulative scheme, and there was no unfair prejudice from the SEC's argument.

Strauss also suggests that this court erred in its decision to "prevent" Strauss from testifying. Under Federal Rule of Evidence 611, this court has discretion to control the order in which witnesses are presented. At the time Strauss was called as a witness by the government, he had the opportunity to cross-examine himself, but he declined to do so. See Trial Tr. at 325-328. The court informed Strauss that if he wished to call himself as part of his own case, he needed to be prepared to do so at the time Kwak finished presenting his case. Id. at 328. Nonetheless, Strauss instead chose to absent himself from the trial during the presentation of all of Kwak and Wilson's evidence. Then, in the late afternoon on Friday, November 16, after the evidence had already closed and the jury had left for the day, Strauss asked during a phone conference if he could testify right before closing arguments on Monday

---

behalf, and thus he could not have had a manipulative intent in engaging in these sales. Strauss Mem. at 5-7. However, Strauss never actually testified to those statements while on the witness stand: he declined to cross-examine himself after he was called as a government witness, and then he absented himself from trial during the time in which he would have been permitted to call himself as a witness in his defense.

    Strauss did testify that he did not believe he had ever participated in matched trades. Trial Tr. at 305. This was not evidence of such overwhelming power as to require a new trial.

14

morning. Id. at 1607. As the court later explained when Strauss renewed his request, the court denied the request because it believed that this would unduly focus the jury's attention on Strauss's testimony, particularly after the court had already explained to the jury that the evidence had closed. Id. at 1648-50. If Strauss had wished to offer testimony, he had multiple opportunities to do so, and the court sees no reason to revisit its prior ruling.

Strauss also suggests he was prejudiced by his inability to cross-examine Steele, but the government never called Steele to the stand, and so there was no impropriety. While Strauss wishes that he had called Steele, he never attempted to do so during the trial, and he in fact absented himself during the portion of trial at which he could have done so.[14]

Strauss's makes two remaining arguments, which deal with the complexity of the case, and with the testimony of the defendant's expert. These provide nothing approaching sufficient reason to order a new trial. Strauss's Motion is **DENIED**.

---

[14] It is highly doubtful that Strauss could have compelled Steele's testimony in any event, given that all indications were that Steele would assert his Fifth Amendment privilege.

## IV.	CONCLUSION

The defendants' post-trial motions [Doc. Nos. 272, 273, 274, 275] are **DENIED**.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 12th of February, 2008.

    /s/ Janet C. Hall
Janet C. Hall
United States District Judge