UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 04-cv-1331 (JCH) |
| v. | : | |
| | : | |
| STEPHEN J. WILSON, | : | JULY 31, 2009 |
| Defendant. | : | |

**RULING RE: DEFENDANT'S MOTION FOR ATTORNEY FEES (DOC. NO. 429)
AND AMENDED MOTION FOR ATTORNEY FEES (DOC. NO. 462)**

**I.     INTRODUCTION**

Defendant Stephen J. Wilson brings two Motions for costs, fees, and expenses

pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.  The first

Motion (Doc. No. 429) seeks costs, fees, and expenses arising directly from his defense

of the instant action.  The second Motion ("Amended Motion") (Doc. No. 462) seeks

fees and expenses incurred in connection with the making of the first Motion.  Plaintiff

United States Securities and Exchange Commission ("SEC") opposes both Motions.

For the reasons discussed herein, Wilson's Motions are granted in part and denied in

part.

**II.     PROCEDURAL HISTORY**

On August 11, 2004, the SEC filed a multi-count Complaint (Doc. No. 1) against

eight defendants, including Wilson, alleging violations of the Securities Act of 1933

("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").  The SEC

alleged that from July 1998 to June 2001, defendants engaged in a "prolonged, multi-

faceted scheme to manipulate" the stock of Competitive Technologies, Inc. ("CTT"), a

Delaware corporation with its headquarters in Fairfield, Connecticut.  Complaint (Doc. No. 1) at ¶ 1.

The SEC's Complaint included five counts, four of which contained allegations against Wilson.  See id.  In Count One, the SEC alleged Wilson violated Section 9(a) of the Exchange Act ("Section 9(a)") by engaging in deceptive practices known as "matched trades" and "marking the close" with respect to CTT stock.[1]  See id. at ¶¶ 51-54.  In Count Two, the SEC alleged Wilson violated Section 10(b) of the Exchange Act ("Section 10(b)"), and Rule 10b-5 promulgated thereunder ("Rule 10b-5"), by engaging in matched trades and marking the close with respect to CTT stock.  See id. at ¶¶ 55-58.  In Count Three, the SEC alleged Wilson violated Section 17(a) of the Securities Act ("Section 17(a)") by placing sell orders to further the alleged matched trade and marking the close schemes.  See id. at ¶¶ 59-62.  In Count Five, the SEC alleged Wilson aided and abetted violations of Section 9(a), Section 10(b), and Rule 10b-5 by co-defendant and purported scheme-leader Chauncey Steele.  See id. at ¶¶ 67-70.  The SEC sought relief against Wilson in the form of an injunction, disgorgement of alleged ill-gotten gains, and a civil penalty.  See id. at 23-24.

A jury trial against Wilson and co-defendants Richard A. Kwak and Sheldon

---

[1] A "matched trade" occurs when an individual enters an order or orders for the purchase or sale of a security registered on a national securities exchange with the knowledge that an order of substantially the same size, at substantially the same time and at substantially the same price, for the sale or purchase of such security, has been or will be entered by or for the same or different parties, for the purpose of creating a false or misleading appearance of active trading in such security or a false or misleading appearance with respect to the market for such security.  See Complaint at ¶ 52; Section 9(a)(1), 15 U.S.C. 78i(a)(1).

"Marking the close" is to effect, alone or with one or more other persons, a series of transactions in any security registered on a national securities exchange creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.  See Complaint at ¶ 52; Section 9(a)(2), 15 U.S.C. § 78i(a)(2).

Strauss commenced on November 5, 2007 and lasted 12 days.  At the close of the SEC's case, Wilson moved for a directed verdict and the court denied the Motion.  <u>See</u> 2007 Trial Transcript ("2007 Tr.") at 1638-1641.  At the close of the evidence, in the context of a ruling pursuant to F.R.E. 801(d)(2) on the admissibility of certain hearsay statements, the court found that the SEC had proven by a preponderance of the evidence that a scheme to manipulate CTT stock existed and that certain statements of Steele's were made in furtherance of that scheme.  The court, however, found that the SEC had not proven by a preponderance of the evidence that Wilson was a participant in the scheme, and therefore instructed the jury not to consider Steele's statements against Wilson.  <u>See</u> 2007 Tr. at 1621-23.

On November 29, 2007, the jury returned a partial verdict for Wilson, finding that Wilson had not violated Section 17(a).  <u>See</u> Verdict Form (Doc. No. 268).  The jury was unable to reach a verdict on the remaining claims against Wilson.  <u>See</u> <u>id.</u>

On December 13, 2007, Wilson filed a Renewed Motion for Judgment as a Matter of Law Pursuant to Fed. R. Civ. P. 50(b)(2) (Doc. No. 273).  On February 12, 2008, the court denied Wilson's Motion, finding that, while the "jury <u>could</u> have returned a verdict in favor of . . . Wilson," the SEC "presented sufficient evidence to enable the jury to return a verdict against [him]."  <u>See</u> Ruling (Doc. No. 305) at 12-13 (emphasis in the original).  In so ruling, the court noted that in evaluating a Rule 50(b) motion the court must consider "the evidence in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences that the jury might have drawn in its favor," <u>Affordable Housing Found., Inc. v. Silva</u>, 469 F.3d 219, 227 (2d Cir. 2006).  <u>See</u> <u>id.</u> at 4.

Following the November 2007 trial, the court afforded the SEC the opportunity to dismiss the remaining claims against Wilson or retry them.  The SEC elected to retry the unadjudicated claims.

At a pre-trial conference held on August 21, 2008, the SEC conceded that it did not have sufficient evidence to proceed to trial on its matched trade claim against Wilson pursuant to Section 9(a)(1) of the Exchange Act.  See August 21, 2008 Pre-Trial Conference Transcript ("Pre-Trial Tr.") (Doc. No. 376) at 27-28.

The second trial against Wilson only began on October 1, 2008.  At the close of the SEC's case, Wilson moved for a directed verdict.  The court reserved ruling on the Motion.  See 2008 Trial Transcript ("2008 Tr.") at 579.  At the close of the evidence, the court again found in the context of a F.R.E. 801(d)(2) ruling that the SEC had proven by a preponderance of the evidence that a scheme to manipulate CTT stock existed and that certain statements by Steele were made in furtherance of that scheme.  The court also found, as it did in the first trial, that the SEC had not proven by a preponderance of the evidence that Wilson was a participant in the scheme, and therefore the court instructed the jury not to consider Steele's hearsay statements.  See 2008 Tr. at 907-911.

On October 14, 2008, the jury returned a verdict for Wilson on all of the remaining claims, see Verdict Form (Doc. No. 420), and on October 23, 2008, judgment entered in favor of Wilson, thereby terminating the SEC's case against him, see Judgment (Doc. No. 426).  Wilson brought the instant Motion for Attorney Fees (Doc. No. 429) and Amended Motion for Attorney Fees (Doc. No. 462) on November 21, 2008 and January 21, 2009, respectively.

-4-

III.    **DISCUSSION**

The EAJA contains two distinct and express statutory waivers of sovereign immunity permitting the recovery of attorney fees in lawsuits brought by and against the United States.  See 28 U.S.C. §§ 2412(b) and (d); see also Wells v. Bowen, 855 F.2d 37, 46 (2d Cir. 1988) (noting that sections 2412(b) and 2412(d) stand "completely apart").  Wilson has, alternatively, claimed entitlement to fees and expenses under both provisions.  See Motion for Attorney Fees (Doc. No. 429) at 1.  The court addresses the two provisions separately.

A.  Wilson's Entitlement to Attorney Fees Pursuant to 28 U.S.C. § 2412(b)

Section 2412(b) states:

Unless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys, in addition to the costs which may be awarded pursuant to subsection (a), to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

28 U.S.C. 2412(b).  Wilson argues that the SEC is liable for his fees under section 2412(b) on two grounds: (1) the common law rule of fee-shifting in cases of "bad faith" prosecution of an action; and (2) Section 9(e) of the Exchange Act, 15 U.S.C. § 78i(e).

1.  Common Law Bad Faith

"The prevailing rule under American common law is that parties to litigation pay their own attorney's fees regardless of the lawsuit's outcome."  Wells v. Bowen, 855 F.2d 37, 46 (2d Cir. 1988).  "However, there is an exception to this general rule when a court determines that an unsuccessful party has acted in bad faith, vexatiously,

wantonly, or for oppressive reasons." Id. (internal quotations omitted).  The Second Circuit has held that, "[i]n order to award bad faith fees, the district court must find that the losing party's claim was (1) meritless; and (2) brought for improper purposes such as harassment or delay."  Kerin v. USPS, 218 F.3d 185, 190 (2d Cir. 2000).

The SEC argues that it did not act in bad faith in bringing or maintaining this action against Wilson and, as a result, Wilson is not entitled to fees under section 2412(b) on the common law bad faith theory.  The court agrees.

While a jury found the SEC's claims against Wilson to be meritless, there is no indication that they were brought for an improper purpose.  As the court noted at both trials, the SEC proved by a preponderance of the evidence that a scheme to manipulate CTT stock existed, and that Steele was a participant in that scheme.  See 2007 Tr. at 1621-23; 2008 Tr. at 907-911.  Furthermore, the juries in both trials found that the SEC proved that Steele violated Sections 9(a) and 10(b).  These facts, together with the evidence of voluminous phone calls between Steele and Wilson and evidence of conduct by Wilson on a few occasions which were consistent with the SEC's view of the Steele scheme, see 2008 Tr. at 910, are sufficient to conclude that the SEC did not pursue its claims against Wilson for improper purposes such as harassment or delay.  Consequently, Wilson is not entitled to EAJA fees under section 2412(b) pursuant to the common law bad faith exception.

2.  Section 9(e) of the Exchange Act

Under Section 9(e) of the Exchange Act, 15 U.S.C. § 78i(e):

Any person who willfully participates in any act or transaction in violation of subsection (a), (b), or (c) of this section, shall be liable to any person who shall purchase or sell any security at a price which was affected by such act

-6-

> or transaction, and the person so injured may sue in law or in equity in any court of competent jurisdiction to recover the damages sustained as a result of any such act or transaction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant.

15 U.S.C. § 78i(e). Wilson argues that, because Section 9(e) authorizes courts to award costs and fees in litigation involving Section 9(a), this court should award such costs and fees in this case pursuant to section 2414(b). The court disagrees.

In Nemeroff v. Abelson, 620 F.2d 339, 349-350 (2d Cir. 1980), the Second Circuit addressed the award of fees under Section 9(e) of the Exchange Act. The court noted that, "[a]lthough the language of § 9(e) makes an award of fees discretionary, the legislative history of this provision indicates that Congress included it to deter bad faith actions and 'strike suits.'" Id. at 349. Thus, the Second Circuit held, the minimum standard for an award of fees under Section 9(e) is that "the action must have been frivolous and without foundation." Id. at 350.

In this case, the court cannot conclude that the action was frivolous and without foundation for the same reasons it cannot conclude that the SEC acted in bad faith. The SEC put forth sufficient evidence for the court to conclude, in both trials, that it proved by a preponderance of the evidence that there existed a scheme to manipulate CTT stock. Further, both juries concluded that Steele violated Sections 9(a) and 10(b). These facts, taken together with the evidence of voluminous calls between Steele and Wilson and evidence of the few occasions on which Wilson's conduct could be viewed as consistent with the SEC's theory of the case, are sufficient to raise the SEC's claim above the level of frivolity. Consequently, Wilson is not entitled to EAJA fees under

section 2412(b) pursuant to Section 9(e).

      B.  <u>Wilson's Entitlement to Attorney Fees Pursuant to 28 U.S.C. § 2412(d)</u>

Before turning to the merits of Wilson's Motion under section 2412(d), the court

must address the preliminary issue of Wilson's eligibility to collect under this

subsection.  As both Wilson and the government acknowledge, Wilson is not entitled to

an award under section 2412(d) unless he is a "prevailing party" for the purposes of the

statute.  <u>See</u> 28 U.S.C. §§ 2412(d).  Because jury verdicts were returned in Wilson's

favor on all of the SEC's claims, it is clear that Wilson prevailed in this suit.  <u>See</u>

Judgment (Doc. No. 426).  The only question, then, is whether Wilson is a "party" under

the statute.

For the purposes of section 2412(d), a "party" is defined as "(i) an individual

whose net worth did not exceed $2,000,000 at the time the civil action was filed . . . ."

28 U.S.C. § 2412(d)(2)(B).  Wilson bears the burden of proving entitlement to fees

under the EAJA.  <u>See</u> <u>NAACP v. Donovan</u>, 554 F. Supp. 715, 718 (D.D.C. 1982) ("The

burden of proof is always on the applicant to prove entitlement to fees").  Wilson

submitted, with his first Motion for fees, an affidavit in which he declared, under penalty

of perjury, that his net worth as of August 11, 2004 was less than $2 million.  <u>See</u>

Statement of Net Worth, Exh. A to Motion for Attorney Fees (Doc. No. 431) at 2.  He

further submitted a personal balance sheet as of August 11, 2004 showing assets of

$977,687 and liabilities of $81,301, for a net worth of $896,386.  <u>See</u> <u>id.</u>

In its Amended Opposition to Defendant's Application for Attorney Fees and

Expenses (Doc. No. 455) ("Amended Opposition"), the SEC asserts that the Affidavit

and balance sheet Wilson submitted in support of his Motion are insufficient to establish

his eligibility for a fee award under the EAJA.  <u>See</u> Amended Opposition (Doc. No. 455) at 5-7.  Specifically, the SEC argues that Wilson "entirely failed to provide any documentation which satisfies his burden of demonstrating that he meets the net worth limitation prescribed under the EAJA" and that his failure "to provide any supporting account or title information" precludes the court from confirming the accuracy of his declaration."  <u>See</u> <u>id.</u>

In response to the SEC's argument, Wilson submitted two supplemental affidavits.  <u>See</u> Supplemental Affidavit of Stephen J. Wilson ("Supp. Wilson Affidavit") (Doc. No. 463) and Affidavit of Kimberly Heath ("Heath Affidavit") (Doc. No. 464).  In the first Supplemental Affidavit, Wilson confirmed that the earlier Statement of Net Worth included all assets and liabilities material to a net worth calculation and confirmed that his net worth as of August 11, 2004 was $896,386.  <u>See</u> Supp. Wilson Affidavit (Doc. No. 463).  In the second Supplemental Affidavit, Kimberly Heath, Wilson's wife and a Certified Public Accountant, declared that she personally gathered documents and information necessary to calculate Wilson's net worth as of August 11, 2004, and prepared the Statement of Net Worth in accordance with Generally Accepted Accounting Principles ("GAAP").  <u>See</u> Heath Affidavit at 2.  Heath supported her affidavit with approximately 25 pages of receipts, account statements, titles, bills of sale, and deeds.  <u>See</u> Exh. D to Heath Affidavit.  Wilson argues that the three affidavits and the supporting documentation are sufficient to satisfy his burden of showing that he is a "party" for the purposes of section 2412(d).  The court agrees.  Wilson must prove his eligibility for EAJA fees by a preponderance of the evidence.  <u>See</u> <u>Sosebee v. Astrue</u>, 494 F.3d 583, 589 (7th Cir. 2007) ("the [applicant] had the burden of showing

[his eligibility for EAJA fees] by the normal civil standard of proof, which is to say by a preponderance of the evidence").  Given the documentation Wilson has provided and the fact that the SEC has offered no evidence calling Wilson's eligibility into question, the court concludes that Wilson is a "party" as defined by the EAJA.  28 U.S.C. § 2412(d)(2)(B).

        1.   Substantial Justification

Because Wilson has demonstrated that he is a "prevailing party" within the meaning of the EAJA, the burden shifts to the SEC to demonstrate that its position was "substantially justified."  Healey v. Leavitt, 485 F.3d 63, 67 (2d Cir. 2007).  In order to meet this burden, the SEC "must make a 'strong showing' that its action was 'justified to a degree that could satisfy a reasonable person.'"  Id. (quoting Pierce v. Underwood, 487 U.S. 552, 565 (1988)).  This requires that its position had a "reasonable basis both in law and fact."  Pierce, 487 U.S. at 565.  In applying these standards, the Second Circuit has made clear that "the Government's prelitigation conduct or its litigation position could be sufficiently unreasonable by itself to render the entire Government position not substantially justified."  Healey, 485 F.3d at 67 (internal quotation omitted).  Further, "[e]ven if the government's initial position is substantially justified, it must 'abandon its opposition to the other party as soon as it becomes apparent that its litigation stance is not substantially justified.'"  United States SEC v. Universal Express, Inc., 2009 U.S. Dist. LEXIS 55064, *27 (S.D.N.Y. June 25, 2009) (quoting Environmental Defense Fund, Inc. v. Watt, 722 F.2d 1081, 1086 (2d Cir. 1983)).  "In the event it fails to do so, a court may award fees for those segments of the litigation during which the government lacked substantial justification."  Universal Express, Inc., 2009

-10-

U.S. Dist. LEXIS 55064 at *28.

In its Amended Opposition, the SEC argues that it was substantially justified in bringing this suit against Wilson because it presented a reasonable factual and legal basis for its claims that Wilson violated federal securities laws and aided and abetted Steele's violations of those laws.  Amended Opposition at 8.  Before turning to the analysis of this argument, it bears noting that the SEC alleged Wilson violated federal securities laws by participating in two separate market manipulation schemes with respect to CTT stock: matched trades and marking the close.  If proven, the schemes violate distinct sections of the Exchange Act; a matched trade scheme violates Section 9(a)(1) and a marking the close scheme violates Section 9(a)(2).  Wilson defended against both of these claims until August 21, 2008, when the court dismissed the matched trade claim after the SEC conceded that it did not have any evidence supporting its position against Wilson with respect to matched trades.  See Pre-trial Tr. at 27-28.

The SEC asserts that, throughout this litigation, its position was substantially justified because the evidence it adduced presented a reasonable factual and legal basis for all of its claims against Wilson.  Specifically, it notes: (1) the evidence of voluminous phone calls between the alleged participants in the scheme, including Wilson; (2) the fact that many of the aforementioned calls were temporally close in time to trades the SEC believed to be suspect; (3) the testimony of SEC expert witness Robert Lowry, finding that Wilson and others engaged in matched trades and marking the close transactions which tended to appear only on days when CTT stock price was declining or when there was little other activity in the market; and (4) Lowry's testimony

suggesting motives for the patterns he observed.  <u>See</u> Amended Opposition at 9.

Wilson, on the other hand, argues that the SEC never had sufficient evidence to include him as a defendant in this action.  <u>See</u> Defendant Wilson's Reply to SEC's Opposition to Motion for Attorney Fees and Other Expenses (Doc. No. 470) ("Reply") at 9.  Rather, he asserts, the SEC's case against him was based on speculation, conjecture, and faulty circumstantial evidence of manipulation.  The court agrees, in part.

First, it bears noting that, as far as the court is aware, it has never been Wilson's position that a Steele-led scheme led to manipulate CTT stock did not exist.  Rather, it has been Wilson's position from the beginning of this action that, if such scheme did exist, he was not a part of it.  Second, after the close of evidence in both the 2007 and 2008 trials, the court found, in the context of a F.R.E. 801(d)(2) ruling, that the SEC had proven by a preponderance of the evidence that a scheme to manipulate CTT stock existed and that Steele was a part of that scheme.  Third, of the eight defendants in this action, five settled with the SEC and one was found liable by a jury on all counts.  Thus, there can be no serious dispute that the SEC was substantially justified in bringing this suit against some of the original eight defendants.

The question presently before the court, however, is whether the SEC was substantially justified in pursuing its claims against Wilson.  While the court finds that the SEC was substantially justified in pursuing its marking the close and aiding and abetting claims against Wilson, the court concludes that it was not substantially justified in pursuing its matched trade claim.

With respect to the marking the close and aiding and abetting claims against

Wilson, given the general evidence which established the existence of the Steele-led scheme to manipulate CTT stock, the testimony of Robert Lowry regarding the method and motives of the scheme, the evidence of voluminous calls between Steele and Wilson, and most importantly, the evidence that on 37 days during the course of the scheme a trade of CTT stock was executed on Wilson's behalf after 3:00 PM, and on 25 of those 37 days there were contemporaneous calls between telephone numbers associated with Steele and Wilson, see 2008 Tr. at 425-427, the court finds that the SEC has satisfied its burden of showing that its marking the close and aiding and abetting claims against Wilson were "justified to a degree that could satisfy a reasonable person." Pierce v. Underwood, 487 U.S. 552, 565 (1988); see Healey v. Leavitt, 485 F.3d 63, 67 (2d Cir. 2007) ("The Government bears the burden of showing that its position was 'substantially justified,' and to meet that burden, it must make a 'strong showing' that its action was 'justified to a degree that could satisfy a reasonable person'" (quoting Pierce, 487 U.S. at 565)).  While the evidence on these claims may have been thin and, ultimately, unpersuasive to the jury, the court cannot find that they lacked a basis in law and fact.

It bears noting, however, that the SEC's evidence on the marking the close and aiding and abetting claims was not robust.  First, although the evidence showed that a trade of CTT stock was executed on Wilson's behalf after 3:00 PM on 37 days during the course of the Steele-led scheme, the scheme was alleged to have lasted from July 1998 to June 2001.  See Complaint (Doc. No. 1) at 2.  Thus, Wilson's alleged marking the close trades appeared on only 37 of approximately 700 trading days during the nearly three-year scheme, or roughly five percent of the time.  See 2007 Tr. at 1622.

As the court noted during its F.R.E. 801(d)(2) ruling during the first trial, given the small percentage of days Wilson's conduct was consistent with the SEC's theory of the case, "it could just as well have been a chance and probability that [Wilson] was in the market on those days." Id. Second, while the evidence showed that a trade of CTT stock was executed after 3:00 PM on Wilson's behalf on 37 days between July 1998 and June 2001, the SEC presented no evidence of when those orders were placed or whether they were "market" orders or "limit" orders.[2] Without this information, it is just as likely that the trades were placed as limit orders at 11:00 AM (which would be inconsistent with a marking the close scheme) as it is that they were placed as market orders after 3:00 PM (which would be consistent with a marking the close scheme). Third, while the SEC presented evidence of voluminous telephone calls made between numbers associated with Steele and Wilson, it did not present any evidence that Steele and Wilson spoke about manipulating CTT stock on these calls. Further, roughly 75% of the calls occurred on days when Wilson did not buy CTT stock. See 2008 Tr. at 793.

As thin as the SEC's evidence against Wilson on the marking the close and aiding and abetting claims was, its evidence on the matched trades claim was even thinner. Despite Lowry's testimony during the first trial that he remembered identifying ten of Wilson's trades that were matched, he did not identify these trades or explain

---

[2] A market order is an order to buy or sell a security immediately at the market price. Testimony of Jonathan Frey, 2008 Tr. at 384. A limit order is an order to buy or sell a security at a specific price (i.e., a buy limit order can only be executed at the limit price or lower; a sell limit order can only be executed at the limit price or higher). Id. An "open" limit order may be executed minutes, hours, or even days after the order is entered. Id. at 395.

why he believed they were matched.[3]  See 2007 Tr. at 618.  There was no testimony at

the trial that Wilson was involved in conversations with anyone regarding matching

trades in CTT stock, and there was no evidence that Wilson ever participated in any

conference calls with Steele and the other co-defendants in the case.[4]  See 2007 Tr. at

1621.  Further, the jury in the first trial returned a verdict for Wilson on the SEC's

Section 17(a) claim, finding that Wilson was not involved in any deceptive or fraudulent

sales of CTT stock.  See Verdict Form (Doc. No. 268).  Finally, and perhaps most telling

for the substantial justification analysis, the SEC itself conceded on August 21, 2008

that it did not have "any evidence left that supports a 9(a)(1) claim."  See Pre-trial Tr. at

27-28.

In light of these facts, the SEC has not met its burden of making a strong

showing that its matched trade claim was "justified to a degree that could satisfy a

reasonable person."  Pierce v. Underwood, 487 U.S. 552, 565 (1988).  Unlike its

marking the close and aiding and abetting claims, upon a neutral weighing of the

evidence, the SEC's matched trade claim against Wilson was simply speculative.  The

claim did not have a "reasonable basis both in law and fact."  Id.  Thus, the court

concludes that, pursuant to section 2412(d), Wilson is entitled to fees incurred for the

---

[3] In its Amended Opposition, the SEC states that, "[t]he Court . . . found the testimony of [SEC] expert Lowry to be persuasive when denying Wilson's Rule 50 motion after the first trial."  Amended Opposition (Doc. No. 455) at 9, n.7.  The court, however, made no such finding.  Rather, the court noted that Lowry's testimony, taken together with the SEC's other evidence and after drawing all reasonable inferences in favor of the SEC, "could rationally support a verdict in favor of the SEC . . . ."  Ruling (Doc. No. 305) at 7.

[4] The lack of evidence that Wilson participated in telephone conference calls was significant because the scheme participants used the conference calls to agree to, carry out, and further the manipulation of CTT stock.  See id.

period he was forced to defend against the SEC's matched trade claim, i.e., until August 21, 2008.

In reaching this decision, the court takes into account that, during this period, Wilson was also defending against the marking the close and aiding and abetting claims. Nevertheless, the court concludes that, because all three claims involve a common core of facts, counsel's time during this period was likely devoted generally to the litigation as a whole, thereby making it "difficult to divide the hours expended on a claim-by-claim basis." Hensley v. Eckerhart, 461 U.S. 424, 435 (1983). Further, because the EAJA "essentially recognized that abusive litigation tactics by the United States government . . . can inflict great unjustifiable cost and expense," and because the EAJA is "designed to furnish relief from such governmental litigation abuse," the court finds it proper to award Wilson fees for the entire period he was forced to defend a claim that was not substantially justified. SEC v. Price Waterhouse, 41 F.3d 805, 809 (2d Cir.1994); see also Cowan v. Prudential Ins. Co. of Am., 935 F.2d 522, 524 (2d Cir. 1991) (holding that "the allocation of fees between successful and unsuccessful claims necessarily lies largely in the discretion of the district court" (citing Hensley, 461 U.S. at 436-37)).

Finally, in light of the SEC's protestations in its Amended Opposition, it bears noting that this holding is not inconsistent with the court's previous rulings. Although the court denied Wilson's Motion for a directed verdict at the first trial, see 2007 Tr. at 1638-1641, as well as his Rule 50 Motion for Judgment as a Matter of Law, see Ruling (Doc. No. 305), these holdings are not, as the SEC suggests, dispositive of the EAJA substantial justification inquiry. See United States SEC v. Zahareas, 374 F.3d 624,

626-627 (8th Cir. 2004) (holding that, "[t]he government . . . is not exempt from liability under the EAJA merely because it prevailed at some interim point in the judicial process") (internal quotation and citation omitted); but see Scipioni v. United States SEC, 2001 U.S. Dist. LEXIS 12897 (S.D.N.Y. Aug. 27, 2001) (holding that, "[b]y denying plaintiffs' motions for summary judgment and for judgment as a matter of law, [the] Court necessarily held that there was a reasonable basis in fact and law for the SEC's position").

The court's holding in Scipioni v. United States SEC, 2001 U.S. Dist. LEXIS 12897 (S.D.N.Y. Aug. 27, 2001) was based on the Second Circuit's ruling in LeBlanc-Sternberg v. Fletcher, 143 F.3d 765 (2d Cir. 1998).  In that case, the Second Circuit held that:

> Certain types of judicial rulings strongly indicate that a plaintiff's claim should not be deemed frivolous, groundless, or unreasonable.  For example, a court cannot properly consider a claim to be frivolous on its face if it finds that the plaintiff must be allowed to litigate the claim.  Nor may a claim properly be deemed groundless where the plaintiff has made a sufficient evidentiary showing to forestall summary judgment and has presented sufficient evidence at trial to prevent the entry of judgment against him as a matter of law.

Id. at 771 (citations omitted).

This court does not agree with the Scipioni court's reading of LeBlanc-Sternberg. As this court reads LeBlanc-Sternberg, the Second Circuit's holding does not preclude a district court from finding that a claim is not "substantially justified" for the purposes of the EAJA simply because the claim survived a motion for judgment as a matter of law. Rather, it precludes a district court from finding that such claim is "groundless," i.e., lacking any support.  The distinction is important.

-17-

In order to survive a Rule 50 motion, the court must find that a reasonable jury would have a legally sufficient evidentiary basis to find for the non-moving party.  <u>See</u> Fed. R. Civ. P. 50.  Thus, a claim that survives a Rule 50 motion must be supported by some minimum quantum of evidence, which necessarily means such claim is not "groundless."  In evaluating a Rule 50 motion, however, the court must assess the evidence "in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences that the jury might have drawn in its favor."[5] <u>Affordable Housing Found., Inc. v. Silva</u>, 469 F.3d 219, 227 (2d Cir. 2006).  By contrast, in order to find that a claim is "substantially justified" for the purposes of the EAJA, the court must find that the SEC has made a strong showing that the claim is "justified to a degree that could satisfy a reasonable person," <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988), but need not give the SEC the benefit of all reasonable inferences.  Consequently, if the court finds that the reasonable inferences which the court was required to draw in favor of the SEC under Rule 50 a reasonable person would, absent the compulsion of the Rule 50 rubric, draw in favor of Wilson, the court may find that a claim which survived a Rule 50 challenge is not "substantially justified" for the purposes of the EAJA.  Such is the situation in this case.

## 2.  Fee Rate

To calculate the amount of attorney's fees to which Wilson is entitled, the applicable hourly rate is multiplied by the number of hours reasonably expended.  <u>See</u>

---

[5] The court relied heavily on this requirement in adjudicating Wilson's Rule 50 Motion.  In fact, the court rejected the vast majority of the arguments Wilson put forth in support of that Motion principally because those arguments "simply fail[ed] to view the evidence in the light most favorable to the SEC." <u>See</u> Ruling (Doc. No. 305) at 7-8.

<u>Hensley v. Eckerhart</u>, 461 U.S. 424, 433 (1983) ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate").  Because the SEC does not object to the reasonableness of the number of hours expended by Wilson's various counsel on this matter, the court need only address the applicable rate.

The EAJA establishes a presumptive maximum fee rate of $125 per hour "unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee."  <u>See</u> 28 U.S.C. § 2412(d)(2)(A)(ii).  Wilson seeks, alternatively, both a special factor increase and a cost of living ("COLA") increase.  The SEC opposes a special factor increase but does not specifically object to a COLA increase.  <u>See</u> Amended Opposition (Doc. No. 455) at 13-16.  The court addresses the special factor increase first.

In <u>Pierce v. Underwood</u>, 487 U.S. 552 (1988), the Supreme Court considered the circumstances in which a special factor increase of the EAJA statutory fee rate would be warranted.  The Court held that:

> [T]he exception for "limited availability of qualified attorneys for the proceedings involved" must refer to attorneys "qualified for the proceedings" in some specialized sense, rather than just in their general legal competence.  We think it refers to attorneys having some distinctive knowledge or specialized skill needful for the litigation in question -- as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation.  Examples of the former would be an identifiable practice specialty such as patent law, or knowledge of foreign law or language.  Where such qualifications are necessary and can be obtained only at rates in excess of the [statutory] cap, reimbursement above that limit is allowed.

<u>Id.</u> at 572.  The Second Circuit has similarly held that, "[a]ttorneys should be awarded

fees above the statutory cap only if they are qualified for the proceedings in some specialized sense, rather than just in their general legal competence," and further that, "[a] case requires 'specialized expertise' within the meaning of the [EAJA], only when it requires some knowledge or skill that cannot be obtained by a competent practicing attorney through routine research or legal experience."  Healey v. Leavitt, 485 F.3d 63, 69-70 (2d Cir. 2007).

Wilson argues that his primary counsel, Attorney Robert Wayne Pearce, is entitled to the special factor increase in this case.  He asserts that Attorney Pearce is qualified for this case in a "specialized sense" and that this case required "specialized expertise" within the meaning of the EAJA.  Id.  The court agrees.

Attorney Pearce holds both a J.D. and an M.B.A.  See Supplemental Affidavit of Robert Wayne Pearce ("Supp. Pearce Affidavit") (Doc. No. 465) at ¶ 3.  The emphasis of his graduate studies in business was on corporate finance as it relates to securities markets.  See id.  After earning his J.D./M.B.A., Attorney Pearce served as an attorney with the SEC's Division of Enforcement, where he received specialized training on all aspects of the SEC's investigative and enforcement practices and procedures, as well as securities broker-dealer practices and procedures.  See id. at ¶ 4.  He also attended the New York Institute of Finance from 1980-1983, where he received specialized training on how securities are issued; the marketplaces for securities; Over-The-Counter ("OTC") and Exchange transactions; how customers input the marketplace to buy/sell securities and the dynamics of the various marketplaces; how fair and orderly markets are maintained by specialists; the processing of securities transactions; how securities transactions are reported, the information available in such reports and the

interpretation of that information; and the risks of investing.  See id. at ¶ 5.

Since 1983, Attorney Pearce has continued his specialized education by attending hundreds of hours of seminars focused on SEC and Commodity Futures Trading Commission ("CFTC") investigation and enforcement proceedings and the practices and procedures of the securities and commodities industry.  See id. at ¶ 6. He has received intensive training on broker-dealer practices and procedures (both front and back office) in the OTC market and the New York Stock Exchange ("NYSE"), the American Stock Exchange ("AMEX"), and the Chicago Board Options Exchange ("CBOE").  See id.  In short, Attorney Pearce has knowledge and skill gained over 25 years of specialized training on the minutiae of broker-dealer practices and procedures and SEC enforcement proceedings which could not be obtained by a competent practicing attorney through routine research or legal experience.  See id.; Healey v. Leavitt, 485 F.3d 63, 69-70 (2d Cir. 2007).  Thus, the court finds that Attorney Pearce is qualified for this action "in some specialized sense, rather than just in [his] general legal competence."  Pierce v. Underwood, 487 U.S. 552, 572 (1988).

Further, the court finds that this suit required "specialized expertise" within the meaning of the EAJA.  Healey v. Leavitt, 485 F.3d 63, 69-70 (2d Cir. 2007).  In both trials, it was clear that the key to Wilson's defense was identifying, analyzing, and communicating to the jury the flaws in the SEC's case.  While poking holes in an opponent's argument is undoubtedly "general lawyerly knowledge and ability useful in all litigation," in this case, the infirmities of the plaintiff's theory were only visible, in the first instance, to someone with an intimate knowledge of the inner workings of the securities broker-dealer industry.  Pierce v. Underwood, 487 U.S. 552, 572 (1988).

Thus, the court finds that specialized expertise of the type held by Attorney Pearce was required to competently defend Wilson in this matter.

Finally, the court finds that the type of specialized knowledge and skills necessary to defend Wilson were not available in Fairfield County, Connecticut or its surrounds at the rate of $125 per hour.  In so finding, the court credits the Affidavit of Carole Bernstein.  See Affidavit of Carole R. Bernstein, Esq. ("Bernstein Affidavit") (Doc. No. 430).  Attorney Bernstein has practiced law in the area of commercial litigation and securities arbitration in New York, New York and Westport, Connecticut for nearly 20 years.  See id. at ¶ 5.  Based on her experience, Attorney Bernstein states that "there are very few attorneys in Fairfield, County, Connecticut with the requisite qualifications, the distinctive skills and specialized expertise necessary to defend this type of case."  See id. at ¶ 8.  Further, Attorney Bernstein declares that she "can state with confidence that none [of the few qualified attorneys in Fairfield County] would have taken this case and defended Mr. Wilson for a fee computed at the statutory rate . . . ." See id.  Despite the SEC's objections that Bernstein's statements are conclusory, the court finds such statements both persuasive and consistent with the court's own knowledge of, and experience with, the Connecticut bar.  While there may be attorneys in Fairfield County with the relevant specialized expertise, none would take defense of this case at the rate of $125 per hour.

Consequently, the court finds that Wilson is entitled to a special factor increase of the statutory fee rate for services provided by Attorney Pearce.  The court will use

Attorney Pearce's actual billing rate of $300 per hour[6] in calculating the fees to which

Wilson is entitled under the EAJA for the defense of this action.[7]  Because Wilson does

not request a special factor increase for services provided by Murphy & Michaels, LLP

and Zeisler & Zeisler, P.C., the court uses the COLA adjusted statutory rate in

calculating the fees to which Wilson is entitled for the services of these firms.[8]

      3.  Expert Fees

      Wilson seeks $50,107.50 in expert fees for the services of Dr. Craig McCann,

Charles Lundelius, and Charles Harper.  <u>See</u> Motion for Attorney Fees (Doc. No. 429)

at 13-14.  Under section 2412(d)(2)(A), for the purposes of 2412(d), "'fees and other

expenses' includes the reasonable expenses of expert witnesses, the reasonable cost

of any study, analysis, engineering report, test, or project which is found by the court to

be necessary for the preparation of the party's case, and reasonable attorney fees

. . . ."  28 U.S.C. § 2412(d)(2)(A).  However, "no expert witness shall be compensated at

---

[6] While the government does not challenge the reasonableness of Attorney Pearce's rate of $300 per hour, the court nevertheless considered the issue and finds that Attorney Pearce's rate is reasonable, especially in the light of prevailing market rates in Fairfield County, Connecticut.  Attorney Pearce is a former SEC staff attorney with over 25 years of specialized training and expertise in securities broker-dealer litigation.  The court is aware of law firms in Fairfield County which charge $300 per hour for the services of their associates.

[7] The court will not, however, use the special factor rate for Attorney Pearce's preparation of the Motion for Attorney Fees (Doc. No. 429), as there is no basis for the court to conclude that the preparation of such Motion required Attorney Pearce's specialized expertise in SEC enforcement proceedings and broker-dealer practices and procedures.

[8] The SEC argues that Wilson is not entitled to recover fees for the services of Murphy & Michaels, LLP, because such expenses were incurred before the SEC filed suit against Wilson in August 2004.  <u>See</u> Amended Opposition (Doc. No. 455) at 16.  The SEC offers no support for this position other than the statute itself.  The court disagrees.  <u>See</u> <u>Kerin v. USPS,</u> 218 F.3d 185, 196 n.7 (2d Cir. 2000) (citing <u>Jacobs v. Schiffer,</u> 204 F.3d 259, 263 (D.C.Cir. 2000) for the proposition that, in the context of an award under section 2412(d), "it is appropriate for the district court to consider the government's litigation position as well as its prelitigation conduct – the action or inaction that gave rise to the litigation").

a rate in excess of the highest rate of compensation for expert witnesses paid by the United States . . . ." Id.

In this case, the SEC has neither submitted to the court the highest rate of compensation it paid its expert witnesses, nor specifically objected to the amounts Wilson seeks for his experts.  Therefore, the court assumes that the rate of compensation for Wilson's experts is not higher than the rate of compensation paid by the SEC for its experts, and the court awards Wilson $34,187.50[9] in expert fees incurred through August 21, 2008.

      4.  Costs

In addition to attorney fees and expert fees, Wilson seeks reimbursement for various costs incurred in connection with this suit.  The SEC argues, and Wilson concedes, that he is not entitled to reimbursement for all of his costs.  See Amended Opposition (Doc. No. 455) at 16; Reply at 3.

The EAJA provides for the assessment of costs "[e]xcept as otherwise specifically provided by statute."  28 U.S.C. § 2412(a)(1).  Under Section 22(a) of the Securities Act and Section 27 of the Exchange Act, "[n]o costs shall be assessed for or against the [SEC] in any proceeding under [the Securities Act or the Exchange Act] brought by or against it in the Supreme Court or such other courts."  15 U.S.C. § 78aa; 15 U.S.C. § 77v.  Because this action arose under the Securities Act and the Exchange Act, Wilson cannot recover any of the costs enumerated in 28 U.S.C. § 1920 from the

---

[9] See Motion for Attorney Fees (Doc. No. 429) at 13-14; see also Robert Wayne Pearce, P.A. Cost Spreadsheet, Exh. E to Motion for Attorney Fees (Doc. No. 431-6).

SEC.[10]  That said, however, Wilson's inability to recover costs does not prevent him from recovering those out-of-pocket litigation expenses that are typically billed to clients and that are not otherwise specifically barred as costs under Sections 22(a) and 27. See SEC v. Kaufman, 835 F. Supp. 157 (S.D.N.Y. 1993), aff'd sub nom. SEC v. PriceWaterhouse, 41 F.3d 805 (2d Cir. 1994).  As a result, Wilson may recover the cost of "postage, telephone charges, overnight delivery services, legal research and travel, as none of these expenses falls within the scope of § 1920 and they are all the type of expenses that would normally be billed to a client."  See United States SEC v. Universal Express, Inc., 2009 U.S. Dist. LEXIS 55064, *44 (S.D.N.Y. June 25, 2009). Accordingly, Wilson will be awarded $22,473.68[11] in out-of-pocket litigation expenses incurred through August 21, 2008.

## IV.    CONCLUSION

For the foregoing reasons, defendant's Motion for Attorney Fees (Doc. No. 429) and Amended Motion for Attorney Fees (Doc. No. 462) are **GRANTED** in part and **DENIED** in part as discussed herein.  Defendant is awarded attorney's fees and costs

---

[10] Courts addressing the provisions of the Securities Act and the Exchange Act that prohibit the recovery of "costs" against the SEC have held that "costs," as used in those Acts, can be given their normal meaning as defined by the plain language of 28 U.S.C. § 1920, which is specifically referred to in 28 U.S.C. § 2412(a).  See, e.g., SEC v. Kaufman, 835 F. Supp. 157 (S.D.N.Y. 1993), aff'd sub nom. SEC v. PriceWaterhouse, 41 F.3d 805 (2d Cir. 1994).

[11] This sum is comprised of $18,118.57 for travel expenses through August 21, 2008; $1,547.99 for express mail and document transport services through August 21, 2008; $2,056.03 for computer-assisted legal research through August 21, 2008; $580.00 for process server fees through August 21, 2008; and $171.09 for facsimiles through August 21, 2008.  See Motion for Attorney Fees (Doc. No. 429) at 15-17; see also Robert Wayne Pearce, P.A. Cost Spreadsheet, Exh. E to Motion for Attorney Fees (Doc. No. 431-6).  Wilson is not entitled to reimbursement for court reporting fees for deposition transcripts, court reporter fees for trial transcripts, and photocopies pursuant to 28 U.S.C. § 1920.  He is not entitled to reimbursement for general office expenses and binders because these expenses are not normally billed to a client.  See SEC v. Kaufman, 835 F. Supp. 157, 160 (S.D.N.Y. 1993).

in the amount of $481,844.09, which includes $409,186.00[12] for attorney fees incurred during the defense of this action, $14,721.91[13] for attorney fees incurred in connection with the Motion for Attorney Fees, $1,275.00[14] for paralegal fees, $34,187.50 for expert fees, and $22,473.68 for out-of-pocket litigation expenses.

**SO ORDERED**.

Dated at Bridgeport, Connecticut this 31st day of July, 2009.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge

---

[12] This sum includes $397,825.00 for the services of Robert Wayne Pearce, P.A. (calculated at the special factor rate of $300 per hour) through August 21, 2008; $7,512.00 for the services of Murphy & Michaels, LLP (calculated at the COLA adjusted rate) through August 21, 2008; and $3,849.00 for the services of Zeisler & Zeisler, P.C. (calculated at the COLA adjusted rate) through August 21, 2008. See Supp. Pearce Affidavit (Doc. No. 465) at ¶ 7.

[13] Calculated at the COLA rate. See Supp. Pearce Affidavit at ¶ 9.

[14] See Richlin Sec. Serv. Co. v. Chertoff, 128 S. Ct. 2007, 2014 (2008) (under EAJA, paralegal fees may be awarded at prevailing market rates); see also Motion for Attorney Fees (Doc. No. 429) at 15-17.